# City of Harrisburg's Appeal.

The erection of market houses upon a public street or square is illegal and will be restrained by injunction.

NOTE.—A municipal corporation has standing to ask for an injunction to restrain and prevent unlawful obstructions upon its streets and property. Pittsburgh v. Epping-Carpenter Co. 194 Pa. 318, 45 Atl. 129; Scranton v.

Although a dedication of land to public use may be by parol as well as by deed, the questions whether the dedication has really been made and for what purpose it has been made are always questions of fact and of intention to be inferred from facts.

The promise of the founder of Harrisburg to execute a deed dedicating land for streets, and his execution of such a deed before executing deeds for abutting lots, rendered such dedication effectual as against claims that the same land had previously been dedicated for a market by the verbal sale of abutting lots.

(Argued May 31, 1887. Decided October 3, 1887.)

May Term, 1887, No. 11, M. D., before GORDON, TRUNKEY, CLARK, GREEN, and STERRETT, JJ. Appeal from a decree of the Common Pleas of Dauphin County sustaining exceptions to a master's report and making perpetual an injunction. Affirmed.

This was a bill in equity filed by the commonweaith of Pennsylvania *ex rel.* the attorney general, and John J. Shoemaker and others, citizens and taxpayers residing and owning property upon a portion of Second street, Harrisburg, known as Market square, against the city of Harrisburg for an injunction to restrain the city from erecting in Market square market houses occupying more ground than those already there. A preliminary injunction was granted. Upon the coming in of the city's answer the cause was referred to C. H. Bergner, Esq., as examiner and master, who found the facts as stated in the opinion of the court below, and recommended a decree dissolving the injunction, and dismissing the bill, at the cost of the complainants.

Scranton Steel Co. 154 Pa. 171, 26 Atl. 1; Philadelphia v. Friday, 6 Phila. 275. And no custom or usage can validate it. McNerney v. Reading City, 150 Pa. 611, 25 Atl. 57. See also note to Butler's Appeal, 1 Sad. Rep. 219.

See also the following editorial notes presenting the authorities on their respective subjects: Prescriptive right to obstruct highway, note to Leaham v. Cochrane, 53 L. R. A. 891; obstructions authorized, note to Spencer v. Andrew, 12 L. R. A. 115; liability of municipal corporations for permitting, note to Cairncross v. Pewaukee, 10 L. R. A. 473; right of abutting owner to place building materials in street, note to Raymond v. Kiseberg, 19 L. R. A. 643; obstruction of street or sidewalk for business or building purposes, note to Flynn v. Taylor, 14 L. R. A. 556; liability of railroad company for obstructing highway crossing, note to Sellick v. Lake Shore & M. S. R. Co. 18 L. R. A. 154; injunction by municipality against nuisances upon, note to Drew v. Geneva, 42 L. R. A. 814; right to maintain awnings in street, note to Augusta v. Burum, 26 L. R. A. 340.

Upon sustaining exceptions to the report and entering a decree continuing and making perpetual the injunction already granted, SIMONTON, P. J., delivered the following opinion:

The commonwealth of Pennsylvania, and certain citizens of Harrisburg, owners of real estate fronting on Market square in said city, seek by the bill filed in this case to obtain an injunction restraining the authorities of the city from erecting new and enlarged market houses in said square.

It is alleged in the bill, as the fundamental reason why the injunction should be granted, that the site of the proposed new buildings is a part of Second street in said city, and that therefore they would be, if erected, an unlawful obstruction to said street. The respondents admit that they intend to erect the buildings, but deny that the proposed site is a part of Second street; and the issue presented by this allegation and denial is the chief question in the case.

The cause was referred to an examiner and master, who took much testimony and made an able and exhaustive report, finding the facts very fully, discussing the law of the case thoroughly, and arriving at the conclusion that Second street does not extend through Market square, and, consequently, that the proposed site of the new market houses is no part of said street; and, therefore, recommending a decree dismissing the bill. The case comes before us upon exceptions filed to this report.

It appears, from the findings of the master and the documents in evidence, that on March 3, 1784, the founder of Harrisburg, John Harris, made a public proposal, in writing, to establish a town on the Susquehanna river, near Harris ferry, and agreed that the general assembly should appoint commissioners to lay out the streets, lanes, and alleys, which he agreed thereupon to convey to the public, and to fix a valuation upon the lots, at which they could be taken, in fee simple or on ground rent, by those who might apply for them.

Commissioners were, accordingly, appointed, who laid out the streets, lanes, and alleys, and appraised the lots, and made a written report or certificate of their doings April 14, 1785. In this they stated that "the said town, with respect to the size of the lots, disposition of the streets, lanes, and alleys, and the choice of the public grounds, was laid out under our direction and inspection, agreeably to the adjoining plan of the said town." The "plan" thus referred to was not placed on record,

and was, within a few years thereafter, lost, to the public at least. There can be no reasonable doubt, however, that it had laid down upon it the space known as Market square; but how it was designated is not certain. Nine of the lots fronting on this square were allotted, in fee simple, or on ground rent with reference to this plan, prior to July 6, 1785; but none of them were conveyed, nor so far as appears was there any written contract to convey any of them until after that date.

On July 6, 1785, John Harris and wife conveyed by deed to said commissioners, in trust, for public use forever, all the streets, lanes, and alleys so laid out. This deed recites, among other things, that John Harris had agreed with said commissioners that he would lay out said town with such streets, lanes, and alleys as they should direct, and that he would confirm such streets, lanes, and alleys for public use forever; that they had been so laid out, and therefore, in consideration of the premises and of five shillings, said Harris and wife bargained and sold to said commissioners, in trust as aforesaid, "all the streets, lanes, alleys, or highways, as laid out by the commissioners, . . . the butts, boundaries, courses, and distances, lengths, and breadths whereof are as follows,—to wit:" Giving first the courses and length of Front street, in degrees and minutes, and in perches, and next "Second street, beginning at the upper end of said town on William McClay's line, at a post marked for a corner, thence extending south 45 degrees, east 63 perches to a corner, thence south 53 degrees, east 189 perches to the end thereof, the breadth whereof is 80 feet from the upper to the lower end aforesaid." Then follows a description of "Market street, beginning in the line of Front street, thence extending at right angles with the same, north 36 degrees and a half, east 85 perches to the end thereof, and one side of the said town, the breadth whereof is 80 feet from the beginning at Front street or the river, to the end aforesaid." Then follows the further description: "Third street, Pine street, Locust street, Walnut street, Chestnut street, and Mulberry street, and each and every of them are 52 feet and ½ foot wide, to extend from the one end or side of the said town to the other. River alley, Raspberry alley, —— alley, Barberry alley, Cranberry alley, Strawberry alley, Blackberry alley, and Cherry alley, and each and all and every of them, are 20 feet wide, and extend from one end or side of the said town to the other end of the same, the situation,

length, and extent of which streets, lanes, and alleys will fully appear in the draught executed by the commissioners, and recorded at Harrisburg, in book A, vol. 1, pp. 76, 77." This "draught," as we have already stated, was not, in fact, recorded.

Evidence was taken on both sides; and the question was much discussed, on the argument of the exceptions, whether Second street could now be located, on the ground, from the description in this deed alone, without recourse to the "draught" therein referred to. All this we consider of no consequence whatever, for the reason that there can be no doubt that it could have been so located at the time the deed was made. The deed calls for "a post for a corner, on William McClay's line." This post was doubtless there; and with it for a starting point, the deed furnished all the data necessary to lay out the street, upon the ground. Neither is there any question as to where it was actually laid. There is no suggestion anywhere that the building line on Second street, on either side, has ever been changed.

It is, therefore, certain that Second street, as described in this deed, if extended from its beginning to its end, according to the courses and distances there given, would pass through Market square, and include the site of the proposed new market houses. Furthermore, the master finds that the plan made by Thomas Forster, pursuant to ordinance of council of June 24, 1796, contains a correct representation of that part of the town of Harrisburg laid out by Harris and the commissioners, and this also shows that Second street, if it extends from its beginning to its end, as described in the deed, passes through Market square, and includes the proposed site of the buildings. There is, therefore, no real controversy as to the location of Second street. The only question is whether this street does really extend continuously the distance of 189 perches, as described in the deed, or whether this (from the description) apparently unbroken progression is interrupted by the northwest, and revived at the southeast, exterior line of Market square.

It is contended on behalf of respondents that the acts done by Harris, prior to the execution of the deed of the streets to the commissioners, including his proposal to the public, his acceptance of the work of the commissioners in laying out the streets, lanes and alleys, and his allotment and sale of lots with reference to their plan, effected a dedication of the streets, lanes and alleys, and of Market square, to the public, prior to the date

of the deed of July 6, 1785, conveying the streets, lanes, and alleys, and that the execution of this deed did not add to the completeness, and could not change the nature of the dedication, and that, therefore, Second street cannot extend through Market square. This argument assumes that, on the commissioners' plan, Second street was not laid down as extending through the square, and that this square was so designated on the plan that this designation, coupled with the fact that Harris made verbal contracts for the sale of lots as numbered upon the plan and received part of the purchase money before he executed the deed for the streets, passed the title to the square by dedication for market purposes so effectually that there remained no title in him to any part of the square nor any right to convey any part of it as a street.

We do not think it is possible now to determine with certainty how Market square was designated on the commissioners' plan. The evidence given by the city engineer, who examined all the deeds on record given by John Harris for lots fronting on the square, shows that in some of them it is described as Market square, in others as Second street, in others as Market square or Second street, in others as Market place, and in others Market space—while they all refer to the commissioners' plan. It must also be remembered that the deed of July 6, 1785, to the commissioners was made by Harris before any of the deeds for the lots.

The statute of frauds was enacted in Pennsylvania prior to 1785; and so far as we can see there is no evidence in this case tending to show that any person had a right to a deed from John Harris for any lot in the town, which could have been enforced on or prior to July 6, 1785. When, therefore, on that day, to carry out an agreement which he had previously made in writing, he made a deed for Second street, which, in unambiguous terms, and by a description and reference to a monument on the ground, was so complete that it was not necessary to refer to the plan to locate it, he did that which no one had a right to dispute or gainsay. And when the purchasers of lots abutting on Market square afterwards took deeds from him for their lots, they took them subject to the rights already conveyed by the prior deed. True, a dedication may be by parol as well as by deed, and however made, when once accepted by those for whose benefit it is intended, it cannot be recalled. But whether it has

really been made and the purposes for which it has been made are always questions of fact, and of intention to be inferred from the facts.

And we think that the fact of the preceding promise to execute this deed, and its actual execution, prior to the making of any deed for any of the lots, with the clear and unambiguous intention expressed in it to dedicate the whole of the premises described in it, as a street, must render such dedication effectual, as against the claims that the same land had previously been dedicated for a different purpose, by the verbal sale of the lots, according to the plan of the commissioners, before the deed for the street was made, or by any other acts or declarations that have been shown to have been done or made, even if the square was designated in the plan as Market square; for there is nothing in this conveyance inconsistent with such a designation. It was very common at that time, and for many years later; and, indeed, might be said to be so still, for markets to be held in the streets and in open squares. Many of the markets at that time, and for long years thereafter, if not even now, although established by law, with the right to hold them vested in individuals or corporations, were located in the open streets. The case of Atty. Gen. *ex rel.* Bailey v. Cambridge, L. R. 6 H. L. 303, furnishes a proof and an example of this. So, too, the *Re* Nightingale, 11 Pick. 169, where an act is cited which prescribes "that the limits of Faneuil Hall Market shall be the lower floor of the building, and the street on each side thereof, called North Market and South Market street."

This usage is recognized also in Denehey v. Harrisburg, 2 Pearson (Pa.) 330, and the claim of the city to profit by it is sustained.

It was also acted upon by the authorities of the former borough of Harrisburg, as is shown by some of the ordinances given in evidence in this case, which ordain that the whole space of Market square, from curb to curb, shall be deemed within the limits of the market.

Many other instances of the same kind might be cited from the reports, were it necessary. The right to use the streets is sustained, upon the ground that the inconvenience to the public, occasioned by the temporary obstruction of the streets, is more than counterbalanced by the increased facilities thus afforded for the sale and purchase of the necessaries of life.

But the erection of permanent structures for any purpose, with one exception, upon a public street or square, has uniformly been held illegal. In Wartman v. Philadelphia, 33 Pa. 210, it is said that members of the common council of Philadelphia were mistaken when they voted, in 1773, that they were satisfied of their right to obstruct the middle of the Market street, if they left a proper space for the passage of carriages; and the market houses built in the middle of it were a nuisance previous to the act of 1804, and any citizen could have abated them.

But it is unnecessary to multiply authorities on this point, as it is not controverted by the respondents. The exception is stated thus by GIBSON, Ch. J., in Com. v. Bowman, 3 Pa. 206: "To allow the county reasonable accommodation for its court house and offices in the great square of the county town is one of the usages of our state which has acquired the consistence of law. Such is the foundation of the county's right, and the extent of it."

The conclusion to which we have come on the main question in the case renders it unnecessary for us to consider the effect of the acts of March 19, 1860, March 22, 1861, and April 1, 1863, and the proceedings thereunder; or of the acts of April 9, 1869, and January 2, 1871. The utmost effect they or any of them could have would be to legalize the present buildings; they could not have the effect of legalizing the erection of new enlarged buildings, not then even thought of, on the line of the street; and the only decree asked for in this case is one restraining the erection of new buildings. We therefore express no opinion on the effect of these acts and proceedings.

We have not overlooked any of the arguments advanced in support of the position taken by the respondents; but without specifically adverting to them, for the reasons suggested above, and others which might be given did space permit, we are constrained to sustain the exceptions, and to consider and adjudge that the preliminary injunction be made perpetual.

The assignments of error specified the decree of the court below.

*Thos. S. Hargest,* for appellant.—If Second street could have been located in 1785 from the deed alone, and there was no necessity for referring to the draught, why was not Second street

made to conform to the deed alone, and thus show a street of uniform width from one end to the other, instead of a street broken and interrupted by a square, as shown by the draught expressly made part of the deed, and which to that extent was in contradiction of the deed description?

As Market square is on the ground, and is in conflict with the deed descriptions, but in exact conformity to the draught made part of the deed, the draught shall control. Com. v. M'Donald, 16 Serg. & R. 390; Schenley v. Pittsburgh, 15 W. N. C. 263.

A space at the intersection of streets making a square, and marked on such a plan, "The Market Square," certainly means a place in which to maintain the public markets.

If such space were to be left open, unimproved, without the buildings in which to hold the markets, the very object of the dedication would fail.

In Klinkener v. M'Keesport, 11 Pa. 444, a space was marked in the plan of the town "for school purposes;" and it was held that although the dedication was made before the common school system was established, yet by provision of law the school district was the proper authority to assume control of the land; and the regulation of school buildings thereon, for common school purposes, was within the trust.

On the map by which William Penn located and dedicated Philadelphia, certain of the spaces set apart for public squares are marked "for public use."

Independence Hall, court house, and other public buildings are erected on one of them because they are held to be within the words "for public use."

In an advertisement published in the London newspapers, admitted in evidence in the case of Com. v. Alburger, 1 Whart. 480, in describing his new city, Penn said: "In the center of the city is a square of ten acres."

"At each angle are to be houses for public affairs, as a meeting house, assembly or state house, market houses, school houses, and several other buildings for public concerns."

This advertisement was taken as evidencing the intention of Penn as to the use to which Centre square was to be devoted; yet nothing appeared on his map of the city by which he dedicated it to show to what public use it was to be applied. It has recently become the site of the public buildings of Philadelphia.

In Re Pennypot Landing, 16 Pa. 79, it was held that the

right to regulate a public landing place dedicated for that purpose by Penn along the Delaware river belonged to the city, and that the building of wharves and the charging of wharfage fees was a public regulation and within the use.

In New Orleans v. United States, 10 Pet. 664, 9 L. ed. 573, there was a dedication of the quay along the Mississippi river. The erection of a market house "rendered necessary for the public service" was held a legitimate use within the scope of the dedication.

To the same effect are Cincinnati v. White, 6 Pet. 431, 8 L. ed. 452, and Barclay v. Howell, 6 Pet. 498, 8 L. ed. 477.

In Beatty v. Kurtz, 2 Pet. 566, 7 L. ed. 521, the dedication contested was by a recorded plot with a space laid off and marked "For the Lutheran Church." A log school house erected on the *locus in quo* was held within the use.

The city of Harrisburg does not contend here that it has the power or authority to erect market houses in one of its streets not opened or dedicated for that purpose, and without the sanction of an act of assembly.

In the case of Wartman v. Philadelphia, 33 Pa. 203, there was no statutory authority enabling the city to erect them; they were subsequently legalized by an act of assembly.

When John Harris accepted the work of the commissioners as returned on their draft on April 14, 1785, ratified the valuation of lots made by them, and subsequently (but prior to execution of the deed of July 6, 1785) allotted nine of the lots fronting on the Market square, according to the aforesaid draft, he irrevocably dedicated the Market square for market purposes, and the streets for public use. His deed of July 6, 1785, could not add to the effectiveness of the dedication.

At that time the doctrine of dedication to public use as part of the common law had not been declared in this country. It was but little known and less understood. The first reported case in which the principle of dedication was adopted and applied was Rex v. Hudson, 2 Strange, 909; the next was Lade v. Shepherd, 2 Strange, 1004, decided three years afterwards. The doctrine was then suffered to sleep until 1790, at least six years after the beginning of the proceedings which resulted in the dedication of Market square. Post v. Pearsall, 22 Wend. 442; Gowen v. Philadelphia Exchange Co. 5 Watts & S. 142, 40 Am. Dec. 489; Com. v. Alburger, 1 Whart. 480.

The act of throwing open property to public use without any other formality is sufficient to establish the fact of the dedication to the public; and if an individual or the city, in consequence of this act, become interested to have it continue so, neither the owner nor his heirs can resume it; nor can anyone claiming under them. Hunter v. Sandy Hill, 6 Hill, 407, 411; Abbott v. Mills, 3 Vt. 521, 23 Am. Dec. 222; State v. Catlin, 3 Vt. 530, 23 Am. Dec. 230; Smith v. State, 23 N. J. L. 140.

Dedication will be presumed from an uninterrupted use by the public. Rex v. Lloyd, 1 Campb. 260; British Museum v. Finnis, 5 Car. & P. 460; Grand Surrey Canal Co. v. Hall, 1 Man. & G. 393.

An open user as of right by the public raises a presumptive inference of dedication, requiring to be rebutted. When such user is proved the onus lies on the party who seeks to deny the inference arising from it to show negatively that the state of the title was such that no one could make a valid dedication. Wartman v. Philadelphia, 33 Pa. 211; Reg. v. Petrie, 4 El. & Bl. 736; Rugby Charity v. Merryweather, 11 East, 375, note; Woodyer v. Hadden, 5 Taunt. 125; Reg. v. Chorley, 12 Q. B. 515; Hunter v. Sandy Hill, 6 Hill, 407; Larned v. Larned, 11 Met. 421, 423; Noyes v. Ward, 19 Conn. 251; Wyman v. New York, 11 Wend. 487; Livingston v. New York, 8 Wend. 85, 22 Am. Dec. 622; Schenley v. Com. 36 Pa. 29, 78 Am. Dec. 359; Com. v. Fisk, 8 Met. 238; State v. Wilkinson, 2 Vt. 480, 21 Am. Dec. 560.

No particular time is necessary for the evidence of the dedication; it may take place immediately. Woodyer v. Hadden, 5 Taunt. 125.

It may be made by parol. Dover v. Fox, 9 B. Mon. 200.

It may be by immediate presumption. Hunter v. Sandy Hill, 6 Hill, 407; Larned v. Larned, 11 Met. 421, 423; Noyes v. Ward, 19 Conn. 251; Schenley v. Com. 36 Pa. 62; Wyman v. New York, 11 Wend. 487; Livingston v. New York, 8 Wend. 85, 22 Am. Dec. 622.

The sale and conveyance of lots in a town and according to its plan imply a grant or covenant to the purchasers that the streets and other public places, indicated as such upon the plan, shall be forever open to the use of the public. Rowan v. Portland, 8 B. Mon. 232–237; Bowlinggreen v. Hobson, 3 B. Mon. 478–481; Huber v. Gazley, 18 Ohio, 18; Dummer v. Den *ex*

*dem.* Jersey City, 20 N. J. L. 86–106, 40 Am. Dec. 213; Wickliffe v. Lexington, 11 B. Mon. 163.

Such time and such only is requisite as suffices to acquire that interest with the public, inconsistent with the claims of the owner which would render it fraudulent in him to resume his rights. Adams v. Saratoga & W. R. Co. 11 Barb. 414; Beatty v. Kurtz, 2 Pet. 566, 7 L. ed. 521; Pawlet v. Clark, 9 Cranch, 292, 3 L. ed. 735.

The same principle and rules apply to the dedication of commons, squares and market places as are applied to public highways. Cincinnati v. White, 6 Pet. 431, 8 L. ed. 452.

In M'Connell v. Lexington, 12 Wheat. 582, 6 L. ed. 735, a spring of water was held dedicated, and the dedication was based upon the concurring opinion of the settlers and the early appropriation of it to public purposes.

Com. v. M'Donald, 16 Serg. & R. 390, was an indictment for a nuisance in inclosing and occupying a portion of Water street, which runs along the bank of the Monongahela in Pittsburgh; and the court held that the maps of the city, both the original and those by which all the regulation of the lines of the city were made, showed the *locus in quo* as dedicated to the public use, although the deed from the Penns to the first purchasers was in conflict with the map.

In Rung v. Shoneberger, 2 Watts, 23, 26 Am. Dec. 95, the proprietor had laid out the town in 1795, made a map of it and sold the lots with reference to the map. On the map was written the words "public square, 106 feet by 156." A square had never been precisely located. The court held that the dedication of a public square, without defining its location, was proved by the inhabitants electing a location for it.

Com. v. Alburger, 1 Whart. 469, was an indictment for a nuisance on one of the public squares of Philadelphia. William Penn had laid out a space for a square on the map or general plan of his town, and sold lots by the map as Harris did here. Afterwards, in 1741, Penn's son, Thomas, for himself and his two brothers, executed a grant to a church of a portion of the square for a burying ground, and it was so used until 1834, when Alburger and fourteen others, trustees, elders, and deacons of the German Reformed Church, were indicted for erecting a fence and wooden building on the part used for the graveyard, and convicted.

Com. v. Bowman, 3 Pa. St. 202, was also an indictment and conviction for public nuisance; the county of Bedford built its court house upon the public square of the town of Bedford, before the year 1800; in 1829 the new court house was built on another part of the same square, but the county continued to maintain the old building by renting out a portion of it for a printing office to one of the defendants, while the other occupied a portion of it as his office of county treasurer. The court held that when a new building was erected the old one should have been torn down or abandoned to the municipal authorities.

Com. v. Rush, 14 Pa. 186, was a case of the dedication of a square of 8 acres at the intersection of streets in the city of Allegheny for specific public purposes, among others for a market place. The commonwealth was the owner of the ground, and directed the laying out of the town; surveys and a map were accordingly made with the square shown thereon. It was held that under the dedication the city of Allegheny was authorized to erect a market house, public buildings, such as a town hall, or other useful building, upon the square, but had no right to sell any portion of it. To the same effect are *Re* Penny Pot Landing, 16 Pa. 79; Baird v. Rice, 63 Pa. 498.

On April 13, 1791, the "act to erect the town of Harrisburg, in the county of Dauphin, into a borough" conferred upon the borough authorities the right to "have, hold, and keep, at the place erected for that purpose, within the said borough, two markets in each week," one on Wednesday and one on Saturday, "in every week of the year forever."

On February 1, 1808, the borough charter was changed by an act "to alter an act, entitled 'An Act to Erect the Town of Harrisburg, in the County of Dauphin, into a Borough.' " 4 Smith, Laws, 487.

The act reaffirmed all the provisions of the first law that were unobjectionable, conferred new and additional powers upon the borough authorities, and superseded the act of 1791. It expressly continued in full force the authority to hold and regulate the markets; it recognized them as then subsisting in the market place, and required that "the said inhabitants shall hereafter hold two markets in each week, one on Wednesday and one on Saturday;" it authorized the appointment of a clerk of the market. Under this continuing power the market houses were enlarged and extended from time to time, and the markets estab-

lished and regulated from that time to the present. At the date of the passage of this last-mentioned act, the market sheds were still standing in the square where they now stand. Comming's Narrative, Egle's History of Harrisburg, 310.

They were regulated by ordinances of the town council from time to time.

The upper one was blown down May 30, 1821, and was immediately rebuilt.

The minutes of the town council show that on July 13, 1822, the lower market house was ordered to be rebuilt and extended, so far as to be uniform in size and appearance with the upper one.

It was found as a fact that the present market buildings were the only public markets ever established in the city.

On March 19, 1860, the city received its charter by the act to incorporate the city of Harrisburg. Pamph. L. 1860, p. 175.

By § 46 of that act all the borough laws and ordinances not inconsistent with it were continued in full force; by § 52 all the property and estate of the borough were transferred to the city; by § 55 the rule of construction was declared to be "that, as often as any doubt shall arise, it shall be taken most favorably for the city;" by § 33 eight commissioners were appointed and authorized to make "a survey and plan of all the lands embraced within the limits of said city, designating thereon the avenues, streets, lanes, and alleys now existing and opened."

The commissioners performed their functions, made and returned a survey and plan showing Second street and the Market square, as it is now defined on the ground.

That survey and plan not only shows the Market square, but exhibits it with the market houses standing thereon as they are at this time; and the work of the commissioners, their plot or draft made out and signed by them, was ratified and confirmed, and made valid in every particular for all legal intents and purposes whatsoever (with few exceptions), by the act approved April 1, 1863. P. L. 1863, 244.

From the date of its incorporation, in 1860, the city has continued in the exercise of its franchises to establish and regulate its markets in the public market place conferred by the act of 1791.

In 1869 the supplement to its charter was passed, by which its limits were extended, and another commission of five mem-

bers appointed, with power to make a correct plan or draft of the city.   P. L. 1869, 771.

This commission discharged its duty, and returned a general map or plan of the city, also showing Second street and the Market square as they exist on the ground, with the market houses thereon.

By the act of January 2, 1871, P. L. 1871, 1556, this plan or draft of the city of Harrisburg and adjacent territory, authorized and required to be made by commissioners appointed for that purpose, under the authority of the act of assembly of April 9, 1869, was ratified and confirmed in every particular, for all legal intents and purposes whatsoever.

August 25, 1874, the city of Harrisburg accepted the provisions of the act classifying cities in this state, approved May 23, 1874.   P. L. 1874, 230.

That act provides, § 57, p. 269, that "no such acceptance [of its provisions] shall be construed to be a repeal or surrender of any rights, powers, privileges, and franchises heretofore by law conferred on such city not inconsistent with the provisions of this act."

The legislature has granted to the people of this city the right of local government, with the right to regulate the use of the Market square, within the object and intention of the dedication.   It retains the paramount right of compelling our municipal officers to observe the terms of the dedication as a trust, and to preserve the property for the use for which it was given. It does not retain, and it never had, the right to destroy the trust, divert the use, and abolish the market place, against the consent of a single person who is the successor in the title to one of the purchasers from Harris or his executors.   Com. v. Rush, 14 Pa. 186; Le Clercq v. Gallipolis, 7 Ohio, pt. 1, p. 217, 28 Am. Dec. 641; Barclay v. Howell, 6 Pet. 498, 501, 8 L. ed. 477, 478; Williams v. First Presby. Soc. 1 Ohio St. 478; Webb v. Moler, 8 Ohio, 552; Price v. Thompson, 48 Mo. 363; Warren v. Lyons City, 22 Iowa, 351; Price v. Methodist Episcopal Church, 4 Ohio, 515; Brown v. Manning, 6 Ohio, 298, 27 Am. Dec. 255; Board of Education v. Edson, 18 Ohio St. 221, 98 Am. Dec. 114; Harris v. Elliott, 10 Pet. 25, 9 L. ed. 333; Campbell County Ct. v. Newport, 12 B. Mon. 538; Augusta v. Perkins, 8 B. Mon. 207; Atty .Gen. v. Goderich, 5 Grant, Ch. (U. C.) 402; Guelph v. Canada Co. 4 Grant, Ch. (U. C.) 654; French v. Quincy, 3 Allen, 9.

*J. M. Wiestling* and *Fleming & McCarrell,* for appellees.—
The erection of a market house in the center of a public street,
rendering, as it does, the highway less commodious, is a nui-
sance which may be prevented by a bill in equity. State v.
Mobile, 5 Port. (Ala.) 279, 30 Am. Dec. 564; Columbus v.
Jaques, 30 Ga. 506; Ketchum v. Buffalo, 14 N. Y. 374.

Legislative sanction or authority for the obstruction of a high-
way or public street, in order to be effective for the purpose,
must be clearly expressed; and such sanction or authority is not
to be inferred without an express enactment. Stormfeltz v.
Manor Turnp. Co. 13 Pa. 555; 1 Dill. Mun. Corp. § 316 and
note; 2 Dill. Mun. Corp. § 521; Angell, Highways, § 237.

And if possible the former use must not be defeated by the
subjection of the land to the additional use. Little Miami & C.
R. Co. v. Dayton, 23 Ohio St. 510.

If it is contended that such legislative sanction may be by
implication, the law holds that such implication arises only
when requisite to the enjoyment of the powers expressly granted,
and can be extended no further than such necessity requires.
Hickok v. Hine, 23 Ohio St. 523, 13 Am. Rep. 255.

PER CURIAM:
The decree in this case is affirmed, on the opinion of the court
below.

Appeal dismissed; and it is ordered that the appellant pay the
costs.