## STATE OF MARYLAND *vs.* JOSEPH BURKETT.

*Markets: stalls; streets; abutting owners.   Baltimore City.*

A market is a public place appointed by public authority for the sale of wares necessary to the maintenance or convenience of life.                                              p. 617

Power conferred upon the Mayor and City Council of Baltimore to maintain and regulate the use of the streets of the city is a trust for the benefit of the general public, of which the municipal corporation can not divest itself.         p. 624

But this power can not be so exercised as to defeat or seriously interfere with the enjoyment of the streets by the public.
                                                          p. 624

The City has the right, in the exercise of the police power delegated to it, to erect market stalls along the curb on Eutaw street, within the limits of Lexington Market, as established by its ordinances, and to authorize and license the use of such stalls for market purposes.                      p. 625

Such a use of the street is a reasonable use of the City's power, and is not a violation of its duties to the public, or to the owners of the abutting property.                  p. 626

The owners of abutting property have the right to use the street as means of ingress and egress to and from their properties, but the right is subject to such reasonable use of the streets, not inconsistent with their use as public highways for the public good or convenience.                         p. 626

*Decided February 12th, 1913.*

Appeal from the Criminal Court of Baltimore City (ELLIOTT, J.).

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, BURKE, THOMAS, PATTISON and STOCKBRIDGE, JJ.

*Robert F. Leach, Jr.,* and *Horton S. Smith* (with whom were *Edgar Allan Poe, Attorney-General,* and *Wm. F. Broening* on the brief), for the appellants.

*Jacob S. New* and *E. L. Stinchcomb* (with whom was *John S. Hessey* on the brief), for the appellee.

THOMAS, J., delivered the opinion of the Court.

The appellee was indicted under an ordinance of the Mayor and City Council of Baltimore for unlawfully resisting and obstructing a certain Thomas H. Paterson while in the execution of his duties as assistant market master and clerk of Lexington market. He filed a special plea to the indictment to which the State demurred. The Court overruled the demurrer and quashed the indictment, and from the judgment quashing the indictment the State has appealed.

The indictment charges that on the 8th day of December, 1911, which was on Friday and was one of the market days of Lexington Market, at the hour of 8 o'clock in the morning, which was within the hours of Lexington Market, "one Pozita Lamartina was lessee and licensee of a stall and stand on Eutaw street between Lexington street and Saratoga street, west of the flag stone on the east side of Eutaw street and within the limits of Lexington Market in said city as prescribed and set forth in an ordinance of the Mayor and City Council of Baltimore, to wit, 'section one hundred and thirty-six of Article thirty-five of the Baltimore City Code of the year 1893,' which stall and stand was and was known as stall No. 330 of Lexington Market" and that on said day and at said hour the appellee obstructed said stall and stand by placing a wagon and cart within the lines thereof as cut in the curbing, and refused to remove said obstruction when ordered

to do so by the assistant market master and clerk of Lexington Market.

The plea admits that the appellee placed a horse and wagon in Eutaw street within the lines of the stand and stall held by the said Lamartina as the lessee and licensee of the Mayor and City Council of Baltimore, and that he refused to remove the same when ordered to do so by the assistant market master and clerk of Lexington Market, and then alleges that as a defense:

> "That the said Eutaw street is a public street and highway of the City of Baltimore, running through said City of Baltimore from the north to the south, and being eighty feet in width from building line to building line, with the road, designed for the use of vehicles, thereof forty-eight feet in width from curb to curb, having in said roadway two car tracks of the United Railways and Electric Company, which said car tracks are located a distance of sixteen feet from the curb on each side of said street and highway, and that the distance between the said two car tracks in the center of the street is four feet and two inches, and that the sidewalks of said street on each side thereof are each sixteen feet in width from building line to curb line; that the said Eutaw street is one of the main highways of the City of Baltimore, having upon it a very large vehicle traffic consisting of the electric cars of the United Railways and Electric Company, running at intervals of two minutes in each direction thereon, and extremely large numbers of automobiles, wagons, carriages and carts, used both for pleasure and business, constantly passing up and down upon said street and highway, and that the side walks thereof, owing to a large number of retail stores occupying the buildings erected on said street, are used and employed by thousands of pedestrians constantly passing to and fro for the purpose of engaging in trade with said stores.

"That the Mayor and City Council of Baltimore owns and operates a market house known as Lexington Market House, situated in the bed of Lexington street and extending from the west side of Eutaw street to the east side of Pearl street, and that the Mayor and City Council of Baltimore has caused and procured the curb on both the east and west sides of Eutaw street aforesaid, between Fayette and Saratoga streets, so being a public street and highway of the City of Baltimore aforesaid, to be marked with lines cut in the curb thereof, which said lines are eight feet apart, and have cut in said curb between each two of said lines a number in figures, the said lines delineating and limiting the boundaries of the market stalls and stands specified and designated by the numbers aforesaid; that said stalls and stands are leased by the said Mayor and City Council of Baltimore to persons desiring to conduct upon the said street and highway, to wit, Eutaw street, on market days as well as other days, the business of trafficking in fruits, nuts, produce, vegetables, flowers and other articles ordinarily sold in public markets, and the said Mayor and City Council of Baltimore issues to each of said persons occupying said stalls and stands a license to deal in the articles aforesaid at said stalls and stands; and that by said leases and licenses so issued as aforesaid, two whole squares or blocks aforesaid of the said street and highway, viz, Eutaw street, is and has been converted, by the said Mayor and City Council of Baltimore, into a market place for the sale of wares ordinarily sold in public markets.

"That the said stalls and stands, so marked upon the curb of the said street and highway, are not located within the market house aforesaid, and are used and occupied by the said lessees and licensees, of which lessees and licensees the said Pozita Lamartina is one, during a large portion of each and every day of the week, Sunday excepted, especially upon the regular market days at said Lexington Market, viz, Tuesday,

Friday and Saturday; that at times the said stalls and
stands are occupied from as early as five o'clock in the
morning until as late as twelve o'clock midnight, and
on numerous occasions, the said stalls and stands are
allowed to be and remain in position during the whole
night.

"That the said stall and stand, number three hun-
dred and thirty, is located about three hundred and
thirty feet north from the aforesaid market house,
known as Lexington Market, and, when occupied and
in use, has erected upon it a removable table or plat-
form constructed of trestles, having one end upon the
sidewalk and the other end in the roadway of the said
street, and having boards placed thereon, on which said
table or platform a stock of fruit, vegetables and otner
produce is kept and exhibited for sale by the said
Pozita Lamartina to such persons as may desire to
purchase the same, and in bad weather a canopy there-
upon about 6' by 10'. That the person in charge of
said stall and stand, when so used and occupied, stands
upon the pavement in front of said stall and stand for
the purpose of vending the produce thereon exhibited,
and that boxes, barrels, baskets and other receptacles
containing fruit, vegetables and other produce are
placed upon the sidewalk adjacent to and in front of
said stall and stand for exhibition and sale, and that
persons desiring to buy said articles congregate upon
the sidewalk in front of said stall and stand for the
purpose of bargaining with the person in charge of
said stall and stand; that quantities of refuse, debris
and offal resulting from the character of the business
there conducted by the said Pozita Lamartina, and
other lessees and licensees of said stalls and stands, are
permitted to be and remain upon the said sidewalk
and roadway adjacent to the said stalls and stands,
and that the said stall and stand is so conducted solely
for the personal gain and profit of the said Pozita
Lamartina.

"That the said stall and stand number three hundred and thirty, so located and marked as aforesaid, is situated directly in front of and about fourteen and three-quarter feet from one of the entrances to the large department stores of Albert A. Brager and A. Stanley Brager, co-partners trading as 'Albert A. Brager,' and known as 'Brager's Department Stores'; that the said stores occupy a frontage on the east side of Eutaw street south of Saratoga street extending from the south side of Saratoga street to a point about one hundred and sixty-nine and three-quarters feet south thereof; that the said stores have three separate doors on the east side of Eutaw street designed and intended for the purpose of ingress and egress to and from the said stores, and for the use of employees, patrons and customers thereof, and further designed and intended for the reception and delivery of the goods, wares and merchandise sold and received in said stores in the course of the transaction of the ordinary business thereof; that the said department stores maintain and keep an extremely large stock of wearing apparel, groceries, house furnishings, furniture, carpets, bedding, notions and all other classes of goods, wares and merchandise ordinarily sold in department stores of its character; that the extent of the business therein conducted is so considerable that it is necessary to keep and maintain a large number of single and double team wagons for the transportation of the merchandise used and sold in said stores, to and from said stores as the same are bought and sold by the proprietors thereof, and that in order to properly receive and deliver the goods, wares and merchandise purchased and sold by said department stores, the said wagons, of necessity, require free access to the street and sidewalk in front of said stores, especially opposite said entrance, in order that they may be loaded and unloaded as they arrive at said premises.

"That as aforesaid, the Mayor and City Council of Baltimore has caused the curb on the east side of

Eutaw street to be marked and numbered along the whole frontage of the said department stores, and that the said stall and stand number three hundred and thirty, of which Pozita Lamartina is lessee and licensee, is but one of a number of stalls and stands of like character occupying from time to time the street and sidewalk of the said Eutaw street in the same manner as that hereinbefore described; that when said stalls and stands, with their accompanying stocks of fruit, vegetables and other produce are occupied and in position, they are so close to the curb as to make it impossible for the wagons of the said department stores or wagons belonging to other persons or the carriages, automobiles or other vehicles used and employed by such members of the public who desire to approach said stores for the purpose of purchasing goods, wares and merchandise therein contained to come closer to the curb line of said street than about five feet therefrom, and that said stalls and stands form a continuous line along the front of said stores on Eutaw street, and that by said stalls and stands free access to said stores by the public and the servants, agents and employees of said stores is obstructed and prevented, and that when said stalls and stands are occupied, the space between the tables placed thereon and the car tracks of the United Railways and Electric Company is only about ten feet.

"That the aforesaid occupation of the said stall and stand, known and numbered three hundred and thirty as aforesaid, by the said Pozita Lamartina, as such lessee and licensee of the Mayor and City Council of Baltimore, as aforesaid, was on the said eighth day of December, in the year 1911, held and maintained without any permission from the employers of this defendant, who were then and there the owners, as aforesaid, of the property before which the said stall and stand was then and there placed, and that the said employers of this defendant had not then and there and theretofore received from the said Pozita Lamartina, or

from the said Mayor and City Council of Baltimore, any compensation of any kind, nature or character for the use, damage to and additional servitude caused to and placed by said occupation of said stall and stand upon the property belonging to the said employers of this defendant.

"That this defendant is the driver and custodian of one of the wagons of the said Albert A. Brager and A. Stanley Brager, co-partners, trading as 'Albert A. Brager,' and as such driver and custodian on the said eighth day of December, in the year 1911, at about the hour of eight o'clock in the morning of said day, placed his said wagon in the roadway of Eutaw street immediately adjacent to the curb thereof, on the east side of said Eutaw street, in order that the said wagon might be loaded with goods, wares and merchandise then being in the said department stores, for the purpose of delivering the said goods, wares and merchandise to the patrons and customers of the said department stores, who had purchased the same from his said employers, and that in so placing the said wagon on the said Eutaw street within the space marked by the lines bounding and limiting the said stall and stand number three hundred and thirty of Lexington Market, this defendant acted solely and only in the course of and in accordance with his employment and duty to his said employers, before whose premises the said wagon was placed by him for the purpose aforesaid, and this defendant could not so place said wagon, then being in his charge and custody, without obstruction to the use of said stall and stand number three hundred and thirty or other stalls and stands of like character, immediately adjacent to it, and if said defendant had obeyed the said order of the said Thomas H. Paterson, so being then and there the Assistant Market Master and Clerk of Lexington Market as aforesaid, this defendant would have been prevented by the erection of said stall and stand number three hundred and thirty from approaching the premises of his said em-

ployers for the purpose aforesaid, because, he says, that said stalls and stands, when so erected as aforesaid, obstruct and prevent the use of the roadway and sidewalks of said public street and highway, to wit, Eutaw street, in the ordinary and usual manner by the occupants of the property binding on said street and highway, and by the public generally desiring to traverse said highway either on foot or in vehicles."

As early as the Act of 1796, Chapter 68, the Mayor and City Council of Baltimore was given the power "to erect and regulate markets," and among the powers conferred upon the City by its present charter is the power "To erect, regulate, control and maintain markets and stalls within the City of Baltimore, and to regulate and control the sale of all goods, wares, merchandise or other articles therein. To lease, sell or dispose of any stalls or stands in any market, in such manner and upon such terms as it may think proper." Act of 1898, Chapter 123.

In *Bouvier's Law Dic.* 97, a market is said to be "A public place appointed by public authority, where all sorts of things necessary for the subsistance, or for the convenience of life are sold." In the case of *Caldwell* v. *City of Alton,* 33 Ill. 416, the Court said: "A market, says *Blackstone* (2 Com. 37), is a franchise or liberty derived from the crown, or in some cases held by prescription, which presupposes a grant, and may be granted to a public body or to a private person."

"It is a designated place in a town or city to which all persons can repair who wish to buy or sell articles there exposed for sale, and in some cities they are known by the articles there exposed to sale. They have been found to be a public convenience when properly regulated. Such regulations as the City authorities may adopt in regard to them should have, and generally have, reference to the preservation of peace and good order and the health of the city. They should be of a police and sanitary character, and an

attempt, by color of regulations, to restrain trade, is an abuse of the power. As the limits of this market are specially defined in the ordinance, and embrace but a portion of the City, the regulations prescribed for it can only operate within those limits. They could not, under this power, be made to extend throughout the city, but must be confined within the market limits."

In pursuance of the power conferred by the Legislature upon the Mayor and City Council of Baltimore, ordinances have been passed from time to time fixing the limits of the several markets in the City. Section 108 of Article 35 of the City Code of 1879, which was a codification of the ordinance then in force establishing the limits of Lexington Market, provided: "The limits of the Lexington Market shall be as follows: beginning with the curb stone on the east side of Eutaw street, and running westwardly the whole width of Lexington Market space, to the west side of Pearl street, and on Lexington street from the east side of Eutaw street, and the west side of Pearl street east to Howard street, and west to Pine street, and all streets crossing or intersecting said space south to Fayette street and north to Saratoga street, subject to the provisions regarding footways, prescribed by section 69, hereinbefore; provided, however, that nothing herein contained shall give the right to any person or persons to place any wagon, cart or other carriage upon Paca, Eutaw, Green or Pearl streets on market days, except the same shall be placed on a line in the center of said streets; and if any person or persons shall violate the provisions of this section, by placing any wagon, cart or other carriage (so as to prevent the access of any other wagon, care or other carriage), to the curb stone opposite any building, without the consent of the owner or occupier of such building, such person or persons so offending shall forfeit and pay a fine of five dollars". Section 108 of the Code of 1879 was amended by Ordinance No. 40 of 1889, and the provision requiring wagons, etc., to be placed in the center of the street was thereby made to apply only to Pine

and Pearl streets, and it is conceded that this amendment
was made because railway tracks had been constructed on
Eutaw, Green and Paca streets.   Ordinance 135 of 1889,
amending Ordinance of 40 of 1889, was repealed and re-en-
acted by Ordinance 169 of 1889, which is found in the
Code of 1893, sec. 136, Art. 35, and in the Code of 1906,
sec. 97, Art. 23, and which provides: "The limits of the
Lexington Market shall be as follows: Beginning with the
flagstone on the east side of Eutaw street, and running
westwardly to Pine street, including the whole width of
Lexington Market space, and all streets crossing or inter-
secting said space, south to Fayette street and north to
Saratoga street, subject to the provisions regarding footways,
prescribed by section 80; provided, however, that nothing
herein contained shall give the right to any person or per-
sons to place any wagon, cart or carriage upon Pearl or
Pine streets, on market days, except the same shall be placed
on a line in the center of said street; and if any person
or persons shall violate the provisions of this section by
placing any wagon, cart or other carriage (so as to prevent
the access of any other wagon, cart or carriage), to the curb-
stone opposite any building, without the consent of the
owner or occupier of such building, such person or persons
so offending, shall forfeit and pay a fine of five dollars
($5.00)".

Sections 62 and 63 of Art. 35 of the City Code of 1893,
(secs. 112 and 113 of the Code of 1906) provide that the
market days for Lexington Market shall be Tuesday and
Friday and Saturday evening, and that the market hours
shall begin at daylight and end at 11 o'clock in the fore-
noon, during the months of October, November, December,
January, February and March, and shall begin at 6 o'clock
A. M. and end at half-past ten o'clock in the forenoon dur-
ing the remainder of the year, "and for the Saturday even-
ing market, the market hours * * * shall begin at sunset and
end at 11 o'clock in the evening," and sec. 53 of Art. 35 of
the City Code of 1893 (sec. 57 of Art. 23 of the Code of

1906) declares that "any person or persons obstructing the streets within the limits of the several markets, at any time not designated by law as the market hours of such market, shall forfeit and pay a fine of five dollars." Ordinance 80 of 1898 provides for the renumbering of the market stalls in the city, and that "All street stalls shall have their numbers cut in the curbing with division line between them," and sec. 12 of Art. 35 of the Code of 1893 declares that "If any person shall resist or obstruct any clerk or assistant clerk of a market in the execution of his duty, he or she shall forfeit and pay a sum not exceeding twenty dollars."

The record contains an agreement of counsel waiving "all errors of pleading" in order that the question as to the right of the Mayor and City Council of Baltimore to license and permit market stalls to be erected and occupied on Eutaw street may be determined.

The learned Court below took the view which has been urged by counsel for the appellee in this Court that the provision of the ordinance prohibiting the placing of any wagon, etc., "To the curb stone opposite any building, without the consent of the owner or occupier of such building," applied to market stands on Eutaw street. But we think it quite clear that that provision only refers to Pearl and Pine streets, in reference to which the ordinance provides that wagons, etc., shall be placed on a line in the center of said streets. Prior to the laying of railway tracks on Eutaw, Green and Paca streets, the ordinance provided that the wagons, etc., should be placed in the center of those streets, and after the railway tracks were so located the ordinance was amended so as to limit that provision to Pearl and Pine streets, and we think that the amendment was also intended to apply to the provision forbidding the placing of any wagon, etc., near the curb stone in front of a building.

The important question to be determined is has the Mayor and City Council of Baltimore the power to establish and license market stalls on Eutaw street in the manner and to the extent indicated by the several ordinances to which we

have referred? The plea alleges that the stalls in question are occupied every day in the week except Sunday, and from an early hour in the morning to a late hour at night. But the indictment charges that the appellee placed his wagon within the lines of the stall held by Pozita Larmatina as licensee on one of the market days and during market hours, and the ordinances provide that the market days and hours for Lexington Market are Tuesday and Friday, from daylight to eleven o'clock in the morning and from sunset until eleven o'clock in the evening on Saturday, and prohibit the obstruction of the streets at other times, and we are only required to determine in this case whether the city has the power to authorize such use of the street to the extent fixed by said ordinances.

In 3 *Dillon on Munic. Corp.* (5th Ed.), sec. 1128, the author says: "By virtue of its authority over public ways, the *Legislature may authorize acts to be done in and upon them,* or legalize obstructions therein, which would otherwise be deemed nuisances. And it may be here observed that whatever the Legislature may constitutionally authorize to be done is of course lawful, and of such acts, done pursuant to the authority given, it can not be predicted that they are nuisances; if they were such without, they cease to be nuisances when having the sanction of, a valid statute. As respects the public or the municipalities themselves, there is, in the absence of special constitutional restrictions, no limit upon the power of the Legislature as to the uses to which streets may be devoted." And in section 1129 he says: "The Legislature, instead of exercising directly this authority as to the uses of streets and public places, may authorize it to be exercised by local or municipal authorities." In the case of *Garrett* v. *Lake Roland R. R. Co.,* 79 Md. 277, JUDGE Mc-SHERRY said: "That can not be a nuisance such as to give a common law right of action, which the law authorizes.—It may be stated as a general rule that whatever is authorized by statute within the scope of legislative powers, is lawful, and therefore can not be a nuisance." And in the case of

*Townsend, Grace & Co.* v. *Epstein,* 93 Md. 537, the Court said: "The Mayor and City Council of Baltimore is invested with the title to and control over the public streets. This control, however, is not an arbitrary control. The streets and highways are held in trust for the benefit, use, and convenience of the general public. There are many ways in which the power to control and regulate the use of the streets can be and must be exerted by the municipality to meet the necessities and the convenience of an urban population; but the exercise of this power must have for its object a public purpose." JUDGE DILLON, in the 4th Ed. of his work on *Munic. Corp.,* sec. 380, says: "In this country the practice is almost universal on the part of the Legislature to confer upon the municipal agencies more or less authority with respect to markets and market places, and such grants are not so strictly construed as those which invest the corporation with powers of a more extraordinary or unusual character." And in section 1175 of the 5th Ed., after stating that the erection of a market house within the lines of a street which interferes with travel may be enjoined, he says: "Similar principles have been applied to the holding of public markets within the street, although no buildings were erected and people were simply permitted to sell from wagons and temporary stands. It has been held that such a use of the city streets without legislative authority is unlawful, and may be enjoined." In support of this statement in reference to holding markets within the street he cites the case of *Richmond* v. *Smith,* 148 Ind. 294, and the case of *McDonald* v. *Newark,* 42 N. J. Eq. 136, and then states: "But the *contrary view was adopted* in *State* v. *Smith,* 123 Iowa, 654, where the conclusion arrived at by the Court was that *such a public market* established by ordinance in a portion of a city street is not a nuisance *per se,* where it constitutes only a temporary or partial obstruction of the street." In the case of *Richmond* v. *Smith, supra,* Smith, the owner of the abutting property, owned the fee in the street, and in the case of *McDonald* v. *Newark, supra,* the Court cited and relied upon the case of *State* v. *Laverack,*

34 N. J. L. 201, in which the defendant's title extended to
the centre of the street, and the Court held that the appropria-
tion of the land for the purposes of a market was "an addi-
tional burthen upon it," and amounted to a taking of defend-
ant's land without compensation within the prohibition of
the constitution of that State.

In the case at bar the plea does not allege that the title to
Eutaw street was in the appellee, and in this State it has been
repeatedly held that where an abutting owner on a street in
Baltimore City does not own the bed of the street, the placing
of an obstruction on the street is not a taking of his property
within the meaning of the Constitution. *O'Brien* v. *Balto.
Belt R. R. Co.,* 74 Md. 363; *Garrett* v. *Lake Roland R. R.
Co., supra.* It is true that while the Court said in those
cases that the use of the street for the purposes therein re-
ferred to was not a taking of the property of the abutting
owner, the Court held that he was nevertheless entitled to
recover such damages as he sustained by reason of an inter-
ference with his right of access, etc., to his property. But
the obstructions there complained of were not authorized or
constructed by the City for municipal purposes, but were
erected by independent corporations and were in their nature
permanent, and in *O'Brien's case,* JUDGE ALVEY cites a num-
ber of cases illustrating the application of the principle that
where injury to abutting property is the result of work done
by the municipality for municipal purposes it must be en-
dured by the owner in order to advance the public good. For
instance, in the case of *B. & P. R. R. Co.* v. *Reaney,* 42 Md.
117, the Court said: "As against the municipal government,
in the careful exercise of its right and power to grade, change
and improve the street, there could be no cause of action for
any unavoidable injury done; but as against the appellants,
a private corporation in no wise connected with the munic-
ipal government, obtaining authority to use the streets in an
extraordinary manner, for its own private purposes and
profit the case is quite different."

In a large city a public market, if not an absolute necessity, is a great public convenience, and the Legislature has therefore delegated to the Mayor and City Council of Baltimore the power to erect and regulate markets and stalls within the city, and to lease, sell or dispose of stalls and stands in the market in such manner as it may think proper. Under this power Lexington Market, including the east side of Eutaw street as far north as Saratoga street, has been established by the Mayor and City Council of Baltimore for more than fifty years, and during that time the owners of property abutting on the streets included within the limits of the market have been subjected to such inconvenience as was incident to the market regulations. As we have said these regulations prohibit the use of the streets in Lexington Market for market purposes except during the hours from day-light to eleven o'clock in the morning on Tuesday and Friday, and from sunset to eleven o'clock on Saturday evening. This use of the streets is authorized by the Mayor and City Council of Baltimore for a public purpose, and not with the view of promoting any private interest. The right of the public and of the owners of property abutting on the streets to use them as public highways is not thereby seriously or permanently interferred with, and the temporary inconvenience to which they are subjected is very slight and only such as is incident to the proper regulation of a great public convenience.

The power to maintain and regulate the use of the streets of the city is a trust for the benefit of the general public, and the Mayor and City Council of Baltimore can not divest itself of this trust, nor can it so exercise its power over the streets as to defeat or seriously interfere with the enjoyment of the streets by the public, but, as said by JUDGE JONES, in *Townsend, Grace & Co.* v. *Epstein, supra.* "There are many ways in which the power to control and regulate the use of the streets can be and must be exerted by the municipality to meet the necessities and convenience of an urban population," and there are many cases in which the right to use the streets, under proper regulations, for the purpose of

a public market and to license market stalls and stands therein, has been recognized and sanctioned by the courts. *Tomlin* v. *City of Cape May,* 63 N. J. L. 429, 44 Atl. 209; *Nightingale, Petitioner, etc.,* 11 Pick. 168; *Commonwealth* v. *Brooks,* 99 Mass. 434; *City of Bowling Green* v. *Carson,* 10 Bush. (Ky.) 64; *Henkel* v. *Detroit,* 49 Mich. 249; *City of Harrisburg's Appeal,* (Pa.) 10 Atl. 787.

In the case of *City of Harrisburg's Appeal, supra,* the Court said: "It was very common at that time, and, for many years later, and, indeed, might be said to be so still, for markets to be held in the streets and in open squares. Many of the markets at that time, and for long years thereafter, if not even now, although established by law, with the right to hold them vested in individuals or corporations, were located in the open streets." After referring to a number of authorities the Court then said: "Many other instances of the same kind might be cited from the reports were it necessary. The right to use the streets is sustained on the ground that the inconvenience to the public, occasioned by the temporary obstruction of the streets, is more than counterbalanced by the increased facilities thus afforded for the sale and purchase of the necessities of life." In the case of *State* v. *City of Cape May, Supra,* the Court said: "The second section of this ordinance, with appropriate penalties for its violation, under the charter of the City, would seem to be a reasonable exercise of the police power; for it is well established that the city authorities of a municipality have the clear legal right to regulate the use of streets by hucksters and other vendors, and to designate market stands, and of limiting the use of the streets to certain hours of the day, and imposing other restrictions for the preservation of the peace and health of the public, and the proper and legal use of the streets by the public."

We are not to be understood as holding that the Mayor and City Council of Baltimore is empowered to authorize and license the obstruction of the streets in front of "Brager's Department Store" *to the extent alleged in appellee's plea,*

but we think the city has the clear right, in the exercise of the police power delegated to it by the Legislature, to erect market stalls on Eutaw street within the limits of Lexington Market and to authorize and license the use of said stalls in accordance with the regulations and to the extent prescribed by the ordinance to which we have referred. Such use of the street in question is a reasonable exercise of the power conferred upon the Mayor and City Council of Baltimore to erect, etc., markets and market stalls within the city, and is not a violation of its duty to the public or to the owners of property abutting on said street in respect to its control over the streets.

An abutting owner has the unquestioned right to the use of the street as a means of ingress and egress, etc., but that right is subject to such reasonable use of the street, not inconsistent with its maintenance as a public highway, as may be necessary for the public good and convenience and does not seriously impair his right.

The right of a lessee of a market stall has been recognized by this Court as a valuable right, and it should be protected by proper regulations. *Green* v. *Western Nat. Bank,* 86 Md. 280; *Pfefferling* v. *Baltimore City,* 88 Md. 475.

It is suggested in the appellee's brief that the section of the City Code of 1893 fixing the limits of Lexington Market, was repealed by Ordinance 649 of 1911, and that Ordinance 649 was repealed by Ordinance 697 of 1911 without re-enacting the section of the Code referred to, but the plea in this case admits that that part of Eutaw street in which the market stall in question is located has been converted by the Mayor and City Council of Baltimore "into a market place".

For the reasons we have stated the judgment of the Court below must be reversed.

> *Judgment reversed, with costs, and the case remanded.*