## MARINE INS. CO. *v.* ST. LOUIS, I. M. & S. RY. CO.

(*Circuit Court, E. D. Arkansas.* February 10, 1890.)

**1. INSURANCE—SUBROGATION—PARTIES.**
Mansf. Dig. Ark. § 4934, providing that, "where the assignment of a thing in action is not authorized by statute, the assignor must be a party, as plaintiff or defendant," has no application to an action by an insurance company which has paid the loss against the wrong-doer occasioning the loss, as it does not sue as assignee, but by right of subrogation, and the insured need not be joined.

**2. SAME.**
Under Mansf. Dig. Ark. § 4933, providing that "every action must be prosecuted in the name of the real party in interest," an insurance company which has paid the insured the full value of his goods destroyed may maintain an action in its own name against the wrong-doer causing the loss.

**3. MUNICIPAL CORPORATIONS—LEASE OF STREETS.**
An attempted lease by a city council of a portion of a street for a private use is void. though owing to its declivity, and its termination upon a river, it was seldom used, except by footmen.

**4. NUISANCE—ACCUMULATION OF COMBUSTIBLE MATERIAL IN STREET.**
The accumulation of a large number of bales of cotton on a public street, near the business center of the city, in such a manner as to obstruct the street, though a passage was left for footmen, by whom it was almost solely used, and to endanger a conflagration by its being fired by passing engines and smokers, is a nuisance.

**5. SAME—LIABILITY OF RAILROAD COMPANY.**
A railroad company, contracting to remove cotton received by a compressing company, from its warehouse where it was received, to its compressing mill, is liable for damages occasioned by a nuisance resulting from the accumulation of the cotton in a public street owing to its failure to remove the same, especially when it had been accustomed to take up the warehouse receipts of that company, and issue bills of lading for the cotton covered thereby, reserving the right to have it compressed, as in the former case it would assist in the creation or continuance of the nuisance, and in the latter would. as a common carrier, permit the accumulation of dangerous material, which it was bound to transport promptly.

**6. SAME—CONTRIBUTORY NEGLIGENCE.**
Where a railroad company, contracting with a compressing company to remove cotton received by the latter from its warehouse to its compressing mill, has failed to remove the same promptly, and permitted its accumulation in such a manner as to create a nuisance likely to occasion its loss by fire, persons delivering cotton at the warehouse are not guilty of contributory negligence; and, if they were, it would be the railroad company's duty to avert the consequence of such negligence.

**7. SAME—DUTY OF CARRIER TO CARRY PROMPTLY.**
A railroad company, receiving and issuing bills of lading for goods, cannot excuse delay in transportation, occasioning such accumulation of dangerous materials as creates a nuisance, on the ground of an unexpected press of business.

**8. INSURANCE—FOREIGN COMPANIES—RIGHT TO DO BUSINESS.**
Where the contract of insurance is made and the policies issued in another state. it cannot be objected that the company has not complied with the laws relating to foreign insurance companies doing business within the state where suit is brought.

**9. SAME.**
The acts of Arkansas relating to insurance forming a distinct title, act of April 25, 1873, providing that no foreign insurance company shall do business in the state without filing with the auditor a stipulation that service may be made on the auditor or an agent designated, is not repealed by Acts Ark. 1887, p. 234, requiring foreign corporations to file with the secretary of state a certificate designating an agent upon whom service may be made.

At Law.　Action for damages.

This suit was brought to recover the value of certain cotton destroyed by fire in the city of Little Rock on the 14th day of November, 1887. The plaintiff, Marine Insurance Company, a corporation created by the

laws of Great Britain, brought the suit against the defendant, the St. Louis, Iron Mountain & Southern Railway Company, a corporation created by the laws of this state, and alleged that prior to the 20th day of September, 1887, the Union Compress Company was engaged in compressing cotton bales for transportation; that its compress was located in Argenta, immediately opposite Little Rock, on the north side of the Arkansas river; that the defendant was a common carrier, owning and operating a railway that formed a connection between certain sheds of the compress company, situated at the intersection of Main and Water streets, in Little Rock, and its compress, in Argenta; that prior to that time the defendant had agreed with the compress company that it would transport the cotton in bales that might be received at said sheds in Little Rock, across the river, to the compress, for compression; that, for the purpose of realizing and increasing the compensation thus agreed upon, the defendants made said sheds a receiving station for all cotton, in common or uncompressed bales, that might be delivered there, giving bills of lading for all cotton deposited there, upon application of consignors, to any point in the United States or Europe, to which it might be consigned, reserving in the bills of lading the right to have the cotton compressed; that while this contract was in force R. E. Douglas & Co. and the Howell Cotton Company placed certain bales of cotton in said sheds, for future compression and shipment, and took out policies of insurance against loss or damage by fire on the same from the plaintiff; that the defendant did not remove the cotton that was received at the sheds from time to time, but suffered it to accumulate until the sheds became full, and the cotton was piled outside, clear across Main street, leaving only a narrow passage-way for footmen, with bales of cotton on either side, thus creating a public nuisance in the street; that defendant neglected and refused to remove the cotton thus accumulated until the 14th day of November, when the pile of cotton in the street caught fire, from accident or otherwise, and extended thence to the sheds, which were burned, together with the insured cotton above named; that the insurance covered the full value of the cotton, which had been paid by the plaintiff to the insured. The defendant demurred to the complaint because the insured, Douglas & Co., and the Howell Cotton Company, were not made parties.

*U. M. & G. B. Rose, E. W. Kimball,* and *Sanders & Watkins.* for plaintiff.

*John M. Moore* and *Dodge & Johnson,* for defendant.

CALDWELL, J., (*after stating the facts as above.*) Our statute requires that "every action must be prosecuted in the name of the real party in interest." Mansf. Dig. § 4933. It also provides that, "where the assignment of a thing in action is not authorized by statute, the assignor must be a party, as plaintiff or defendant." Section 4934. The latter section has no application to the present case. The complaint does not allege any assignment. The right of the insurance company that has paid a loss to recover of the wrong-doer, after payment of the loss, does not depend upon contract, agreement, stipulation, or privity. Sheld. Subr. § 1.

The right of subrogation is sometimes spoken of as an "equitable assignment," but that is only a convenient figure of speech. From the time of the insurance the insurer has a pecuniary interest in the thing insured, and he becomes entitled to a legal remedy whenever he suffers a loss by reason of that interest, and it appears that the loss has been occasioned by the wrongful act of another. Of course, he has no right of action until he has paid the loss to the insured, because until that time he has suffered no damage. In *Deshler* v. *Dodge,* 16 How. 622, the plaintiff brought replevin for bills that had been assigned to him, and it was held that he was not suing in the character of assignee. So it has been held that, when a note is made payable to bearer, a transferee thereof does not hold by assignment, and that an executor holding under a will of his testator does not hold as assignee. *Bushnell* v. *Kennedy,* 9 Wall. 387, and cases cited. In *Insurance Co.* v. *Insurance Co.,* 129 U. S. 462, 9 Sup. Ct. Rep. 469, the court say:

"From the very nature of the contract of insurance, as a contract of indemnity, the insurer, upon paying to the assured the amount of a loss, total or partial, of the goods insured, becomes, without any formal assignment, or any express stipulation to that effect in the policy, subrogated in a corresponding amount to the assured's rights of action against the carrier, or other person responsible for the loss, and in a court of admiralty may assert in his own name that right of the shipper."

In respect of parties plaintiff, the first section of our Civil Code above cited renders our practice similar to that prevailing in the admiralty courts. It has been held under its provisions that the holder of a promissory note payable to order might sue on it without joining the payee, though the latter had never indorsed it. *Heartman* v. *Franks,* 36 Ark. 504. And it is held that, under the reformed codes of procedure, the action of the insurance company, in cases of this sort, may be brought in the name of the insurer. Sheld. Subr. § 230; *Swarthout* v. *Railway Co.,* 49 Wis. 625, 6 N. W. Rep. 314; *Insurance Co.* v. *Railway Co.,* 73 N. Y. 405. Where the value of the property destroyed exceeds the insurance money paid, then the suit must be brought in the name of the insured, (*Insurance Co.* v. *Railroad Co.,* 3 Dill. 1;) though doubtless, under our system of practice, the insurer might be joined where the joinder would not oust the jurisdiction of the court, (*Crandall* v. *Transportation Co.,* 16 Fed. Rep. 75.) But, as it is alleged in the complaint in this cause that the plaintiff has paid the insured the full value of the property destroyed, it is plain that the latter have no interest in the present controversy, and hence that they are not necessary parties.

That the plaintiff is suing in its own right, and not as assignee of the insured, although its title may be in some sense derivative through them, is a proposition that is made equally obvious by the decision in *Railroad Co.* v. *Dow,* 120 U. S. 287, 7 Sup. Ct. Rep. 482. In that case Dow and others, acting as trustees under a mortgage, had expended money in taking up a prior mortgage, given to secure a debt bearing the conventional rate of interest of 10 per cent. per annum, the legal rate being 6 per cent. per annum. The trustees brought suit, claiming that they

were entitled to enforce the prior mortgage, and that, standing in the shoes of the mortgagee, they should be allowed interest on the debt secured by the mortgage at the conventional rate; but the court refused to entertain this view, and held that after payment the trustees could claim no more than 6 per centum per annum. The court said: "The right of subrogation is not founded on contract. It is a creature of equity, is enforced solely for the purpose of accomplishing the ends of substantial justice, and is independent of any contractual relations between the parties." And in *Johnson v. Barrett*, 117 Ind. 551, 19 N. E. Rep. 199, the court say: "Subrogation is the substitution of another person in place of a creditor, so that the person substituted will succeed to all the rights of the creditor, having reference to the debt due him. It is independent of any merely contractual relations between the parties to be affected by it, and is broad enough to include every instance in which one party is required to pay a debt for which another is primarily answerable." The demurrer was overruled.

The defendant then filed an answer, admitting the contract between it and the Union Compress Company; but it denied that it had made the cotton sheds in Little Rock a receiving station for the shipment of cotton; asserted that the cotton in the sheds was solely in the possession and under the control of the compress company; denied that it ever induced shippers to deliver cotton at the sheds, or that it ever permitted cotton unreasonably to accumulate at that place; denied that it had participated in the creation of a public nuisance in the street; denied all carelessness; and asserted that the insured were stockholders and officers of the compress company, and that by storing the cotton in the sheds they had contributed to the loss thereof. The defendant pleaded further that the plaintiff was a foreign corporation, doing business in the state of Arkansas, and that at the time of the issue of the policies it had never complied with the requirements of a statute of that state mentioned in the opinion of the court.

The cause was tried before a jury, when the following facts appeared in evidence: The cotton sheds referred to were located on the corner of Main and Water streets, in Little Rock two streets that cross each other at right angles; the latter street running parallel with the Arkansas river, which was near by. At that point Main street approaches the river by a steep descent, and is therefore rarely used, except by footmen, by whom it was much used, mainly in going across Water street to a clubhouse built near the river, and for the purpose of crossing the river on several skiff ferries that landed at the foot of Main street. On Water street the defendant operated its railroad, which had a switch made for the purpose of receiving cotton from a platform built in front of the cotton sheds by the compress company. By the terms of the agreement between the compress company and the defendant, made early in September, 1887, the defendant was to take cotton in common bales delivered at the sheds to Argenta for compression, for the price of two dollars a car; and, as common carriers preferred to have the cotton compressed for

the convenience of transportation, it was agreed that the compress company should load the cotton on cars to be provided by the defendant in Little Rock, whence it was to be carried to the compress in Argenta, and there compressed by it, and reloaded on cars for further shipment to any point to which it might be consigned; the compress company insuring the cotton from loss by fire while it might be lying at the sheds, and subsequently, until reloaded on the cars after compression, for the benefit of the defendant, all for the price of 13 cents for each hundred pounds of cotton. The Memphis & Little Rock Railroad Company also had a like arrangement with the compress company, but it had no access to the sheds in Little Rock, and could only get the cotton to be shipped by its line by a side track running by the compress building, in Argenta. The custom of doing this business was of some years' standing, and had its origin in a like agreement between the Little Rock Oil & Compress Company and the defendant. The Union Compress Company was organized in June, 1887, and succeeded to the property and business of the former company; and at the beginning of the cotton season of that year it renewed and continued the agreement that previously had been acted upon. The customary manner of doing the business was as follows: Any shipper in Little Rock, having cotton to ship to any point in the United States or Europe, would take it to the cotton-sheds, and thereupon the compress company would give him a receipt for the same, in the form of a printed warehouse receipt. This the shipper would take to the office of the defendant, or to that of the Memphis & Little Rock Railroad Company, which would take up the receipt, and would give to him a bill of lading for the transportation of the cotton to its final destination in Europe or America, reserving in the bill of lading the right to compress the cotton so received. Upon this the railway company notified the shipment to the compress company, which at once insured the cotton for the benefit of the railway company, as above stated.

It appeared that very large quantities of cotton were thus received by the compress company during the three months immediately preceding the fire. The evidence showed that the defendants had not furnished cars to remove the cotton thus deposited; that the place where it was deposited was near the business center of the city; that the compress company exercised control over its sheds and grounds in Little Rock; but that at the compress in Argenta there was a shipping clerk, whose salary was paid by the compress company and the defendant jointly. At the time of the fire the cotton had accumulated at the sheds until there were from 3,600 to 4,000 bales at that place. The sheds had been filled to overflowing, until a lower story on Water street, not intended for the storage of cotton, had been filled, after which cotton was placed outside, on the platform utilized in loading it on cars, and then it had been piled across Main street, which was shown to be a public street, leaving only a narrow way for footmen to pass, as above stated. At the time of the fire there were thus deposited 1,463 bales of cotton for which bills of lading had been given by the defendant, and 1,211 bales for which the Memphis & Little Rock Railroad Company had given bills of lading.

The rest of the cotton, including that to which this suit directly relates, was unbilled. There was evidence to show that it was the custom of shippers to deposit cotton of a grade required until the proper number of bales of that grade could be gathered together, when it would be shipped under one bill of lading. Further, that the cotton of Douglas & Co. and the Howell Cotton Company was thus deposited waiting an opportunity to make corresponding additions preparatory to shipment. It also appeared that, owing to the block of cotton at the sheds in October and November, the compress company had objected to the depositing of cotton at the sheds, unless for the purpose of immediate shipment; but that it had never actually refused to receive any cotton brought to its sheds, and that defendant had continued to give bills of lading for all cotton which was offered for shipment, down to and including the day of the fire. It also appeared that Douglas & Co. and the Howell Cotton Company were fully aware of all the facts above stated at the time the insurance was taken, and one or more members of each firm owned stock in the compress company; and that the cotton insured by them would have been included in bills of lading within a day or two, if the fire had not occurred. Of all the cotton shipped from Little Rock during the cotton season of 1887, being about 35,000 bales previous to the fire, only about 50 bales, as it appeared, had been shipped from any other point save the cotton sheds of the compress company, and some 500 to 1,000 bales that had been hauled to the depot of the Memphis & Little Rock Railroad Company in Little Rock, on account of the block of cotton at the sheds at the foot of Main street. At the time of the fire the accumulation of cotton at the sheds had been going on for five or six weeks, and some of the cotton that was burned had been entered on bills of lading as much as five weeks before the fire. It was shown that at that time the weather was unusually dry; that, while other persons having cotton near the railway sprinkled it after the passage of each train, nothing was done to protect the cotton in and near the sheds at the foot of Main street, except that a watchman was kept to look after it. Persons smoking pipes, cigars, and cigarettes passed at will along the passage on Main street, between the cotton bales, and the cotton had been previously fired more than once by accident, and the fire had been put out. It was shown that the officers of the compress company, during the time that the cotton was there accumulating, made repeated demands on the defendant for cars to remove the cotton, but that none were furnished.

The defendant introduced testimony to prove that during the autumn of 1887 there was a large and unexpected increase of freight for its road, growing out of an unexpected increase in the manufacture of lumber and the early maturing of the cotton crop, so that it was impossible to procure cars to meet the demand thus made; but the car-service agent of the defendant, being one of its witnesses, testified that in 1887 there were plenty of cars at Little Rock to have removed the cotton, and that he did not know why it was not removed. The defendant offered to prove that the city council of Little Rock had leased the ground in Main street,

at the foot thereof, to the Little Rock Oil & Compress Company for the storage of cotton, and that it had succeeded to its rights. This was objected to, because the council had no right to lease a public street for private uses, and because the lease provided that it should not be assigned without the council's consent, which was not shown. The plaintiff read an ordinance of the city forbidding, under a penalty, the storage of goods or commodities on the streets, and a proclamation of the mayor of the city, issued in September of 1887, calling attention to the illegality and danger of storing cotton in the streets. The evidence also showed that the bales of cotton in the street had been, for the most part, if not all, cut open for the purpose of sampling them, and that holes were thus left in the bales where the cotton was exposed; also that the baling covering the bales was made of cloth of a very inflammable character. The fire originated in or near the narrow passage between the bales on Main street, and was kindled by a match in the hands of a boy, who was passing, and who was smoking a cigarette. The fire destroyed all the property above mentioned, and much other valuable property, real and personal.

As the questions involved in this case have been extensively discussed, and the case itself presents some novel features, I think it proper to state my conclusions of law upon the evidence adduced. As to the more material questions of fact, there is hardly a conflict in the testimony.

I have had no difficulty in excluding the lease from the city council. To say nothing about the clause against assignment of the lease, it was plainly *ultra vires*, and void. The streets of the city do not belong to the council, but to the public,—and by that I mean the public at large, and not merely the inhabitants of the city,—and to their use they are forever dedicated. The city charter makes it the duty of the city council to keep them open and free from nuisance. It provides that "the city council shall have the care, supervision, and control of all the public highways, bridges, streets, alleys, public squares, and commons within the city; and shall cause the same to be kept open and in repair, and free from nuisance." See Mansf. Dig. 737. The only legal effect of the lease, it would seem, is to render the city liable for the damages resulting from such a licensed nuisance. *Cleveland* v. *King*, 132 U. S. 295, 10 Sup. Ct. Rep. 90. It makes no difference that, owing to the declivity at the foot of Main street, the street at that point was not commonly frequented by vehicles. The requirements of the public as to property set aside for its perpetual use was not a matter to be passed on by the council, and it is plain that, by the establishment of a ferry or the building of a bridge at that point, it might at any time become one of the most frequented of all the thoroughfares of the city, the expansion and amelioration of which cannot be hindered by leases of the streets by the city council. The law is well settled, as it ought to be, that all such leases are void. 2 Dill. Mun. Corp. § 660; *McDonald* v. *Mayor*, (N. J.) 7 Atl. Rep. 855; *Harrisburg's Appeal*, (Pa.) 10 Atl. Rep. 787; *Gas Co.* v. *Teel*, 20 Ind. 131.

The Union Compress Company and the defendant had the same right to use Main street that others had; no greater, and no less. Cotton or commodities of any kind may be lawfully placed in the street for immediate transportation, but no one can have the right to appropriate any part of a street to a private use. The city ordinance that was read only gives emphasis to what was the law before it was passed, and what would remain the law if it were repealed. The storage of goods or impediments of any kind on the street for an unreasonable time is an act that constitutes a nuisance. *Patterson* v. *Railroad Co.*, 56 Mich. 172, 22 N. W. Rep. 260; *Henry* v. *Dennis*, 93 Ind. 452, 47 Amer. Rep. 378; *Maddox* v. *Cunningham*, 68 Ga. 431; *Turner* v. *Holtzman*, 54 Md. 148; *Wendell* v. *Mayor*, 39 Barb. 336; *Callanan* v. *Gilman*, 107 N. Y. 360, 14 N. E. Rep. 264. And one who thus encroaches on a street for an unreasonable length of time is guilty of creating and maintaining a nuisance, whether the encroachment materially interferes with the use of the street or not. "The right to pass and repass upon a public highway is not restricted to any part, for ' the public are entitled not only to a free passage along the highway, but to a free passage along any portion of it not in the actual use of some other traveler.' 1 Hawk. P. C. c. 32, § 11." *State* v. *Berdetta*, 73 Ind. 185, 38 Amer. Rep. 117, and note. In this case there was not only an obstruction of the street, but the obstruction was caused by many thousands of bales of cotton, a very combustible material, contiguous to the business center of the city. It was created and continued for several weeks through a very dry season, when the cotton was in danger of being fired by the sparks of passing locomotives, by persons smoking in the street, and by other means. Considering the fact that it would be next to impossible to extinguish a fire originating in this accumulation of combustible material until the whole of it should be consumed, and that the fire thus kindled would probably be communicated indefinitely to buildings and property throughout the city, involving not only great pecuniary loss, but probably loss of life as well, it is impossible to say that this aggregation of cotton thus placed was not a nuisance of a very alarming nature. What did happen—the burning of the cotton, with much valuable adjacent property—was just what might have been reasonably apprehended, and what it seems was apprehended by the officers of the compress company.

It is not necessary to say that the defendant was the sole party in fault in the matter; for whoever aids or assists in creating, maintaining, or continuing a nuisance is responsible for any loss or damage that may be caused thereby. What was called the "cotton shed" of the compress company, at the foot of Main street, was simply a large brick building, covered with a gravel roof, two stories in height, the upper story being intended for the storage of cotton, having an incline by which bales of cotton were rolled down to the lower story for compression by the machinery which had been formerly operated in the lower story, but which had been removed some months before the opening of the cotton season of 1887. This lower story, not intended for the storage of cotton, was covered in front with iron, with several doors opening on the platform

which formed a connection with the cars of the defendant on its side track, whenever they were placed there for the purpose of receiving it. As the cotton was not removed by the defendant as it came in, the upper story became filled, and new accessions of bales were placed in the lower story, until that was filled; whereupon cotton newly arrived was placed along the platform outside, and on the street, until it covered the entire street for a considerable distance, except the narrow passage-way for pedestrians. Witnesses testify that, if the cotton had been removed as it came in, the compress company would have had room for the convenient storage of all cotton that was left there temporarily for the making up of lots for shipment. That the defendant is responsible for the state of things that resulted in the fire, causing the loss for which the plaintiff sues, I have no doubt. If it had removed the cotton as it was received, the cotton in the sheds would have been reasonably safe,—as safe as cotton deposited in other sheds in the city. This is not a suit upon the contract between the compress company and the defendant, but the action is based on the assumption that the defendant contributed to the creation and continuance of the nuisance. If A. should make a contract with B., by which the latter should contract to deliver to him in front of his premises in the street a certain quantity of gunpowder, agreeing that he would remove it to a place of security, or to a place less dangerous, and he should not remove it after delivery, but should suffer it to remain in the street until it exploded, to the injury of a third person, he could hardly be heard to say that the nuisance was created by B., and not by himself. One may become responsible for aiding in the creation of a nuisance either by action, or by neglecting to act. It is not necessary to weigh the comparative responsibility of the defendant and the compress company. The latter might have broken off its contract with the defendant, and have refused to receive cotton after the breach of the contract became apparent; but I do not think that it lies in the mouth of the defendant to say that it ought to have done so; and it seems to me that the prime fault was in the defendant in not removing the cotton as it had agreed to do, and promptly, as the exigency of the case demanded. At any rate, by its participation in the illegal acts complained of, it became liable for any loss that might occur, without regard to any question of liability on the part of the compress company.

Where the negligence of two or more persons contributes to occasion a loss to a third person, they are both liable for the damage sustained. *Slater* v. *Mersereau*, 64 N. Y. 138. So where a landlord has a sidewalk that is out of repair, and he leases it, with a convenant on the part of the tenant to keep in repair, and after that one is injured by reason of the defect in the sidewalk, the landlord and the tenant are both liable for the injury. *Davenport* v. *Ruckman*, 37 N. Y. 568. Where an injury is the result of two concurring causes, the party responsible for one of these causes is not exempt from liability, because the person who is responsible for the other cause may be equally culpable. *Lake* v. *Milliken*, 62 Me. 240; *Barrett* v. *Railway Co.*, 45 N. Y. 628; *Pretty* v. *Bickmore*, 6 Moak, Eng. R. 182. If we might say that the nuisance was created

by the compress company, it would nevertheless be true that the defendant would be liable for the loss arising from the conflagration, since it is true that any one that continues a nuisance is as guilty as he that creates it. *Wasmer* v. *Railroad Co.*, 80 N. Y. 212; *Brown* v. *Railroad Co.*, 12 N. Y. 487. Those who create or continue a nuisance in a street are bound, at their peril, to keep the street as safe as if the nuisance was not there. *Irvin* v. *Wood*, 4 Rob. (N. Y.) 142; *Wendell* v. *Mayor*, 39 Barb. 336; *Anderson* v. *Dickie*, 26 How. Pr. 117; *Congreve* v. *Morgan*, 18 N. Y. 84; *Bizzell* v. *Booker*, 16 Ark. 308; *Bonnell* v. *Smith*, 53 Iowa, 282, 5 N. W. Rep. 128. One who creates a nuisance, or who continues it, is liable for any damage caused thereby, though the immediate cause may have been the negligence of another person. *Myers* v. *Malcolm*, 6 Hill, 292; Wood, Nuis. § 142; *McAndrews* v. *Collerd*, 42 N. J. Law, 189.

The liability of the defendant may, however, be placed on a distinct ground equally secure. The denial in the answer that the defendant did not make the cotton sheds one of its receiving stations is overturned by all the evidence in the case. Practically all the cotton that was shipped from Little Rock in the autumn of 1887, prior to the fire, was shipped there. It will not avail the defendant to say that the cotton at the sheds was in the exclusive control of the compress company. As for the 1,463 bales for which it had issued its bills of lading, they are by law conclusively presumed to have been in its possession, (Acts Ark. 1887, p. 84;) and, as to the 1,211 bales for which bills of lading had been issued by the Memphis & Little Rock Railroad Company, they were held by the compress company subject to its orders, and as its agent. Without these the remaining cotton, embracing that for the value of which this suit is brought, could not have been destroyed in the way in which it was destroyed. Now, a railroad company which allows explosive or combustible materials to accumulate at a station until they become a nuisance must necessarily become liable for any injury sustained by reason thereof. *Railroad Co.* v. *Conway*, 8 Colo. 1, 5 Pac. Rep. 142; *Scott* v. *Hunter*, 46 Pa. St. 192; Wood, Nuis. § 142; *Lake* v. *Milliken*, 62 Me. 240; *Bradley* v. *People*, 56 Barb. 72.

The plea of contributory negligence is not sustained. The delivery of the cotton at the sheds by the insured was in no sense a proximate cause of the loss, and no act of negligence on the part of the plaintiff that is not a proximate cause of the injury complained of can be considered in the light of contributory negligence, such as will bar a right of action. Beach, Contrib. Neg. § 10. Moreover, the defendant gave bills of lading for all cotton that was offered to it for shipment, down to the very day of the fire; and it cannot now be heard to say that it was the fault of any one to trust it to perform its duty because it had shown itself to be untrustworthy in the past. Immunity from liability is not to be secured by a train of misconduct, however long continued.

A few cases illustrative of this principle may be mentioned. A tenant rented certain lands for 1877, knowing that a railroad company maintained a nuisance thereon in the shape of a pond of water, which affected the health of his family. With this knowledge he rented the place

for the year 1878, when it became more sickly, so much so that he was unable to gather his crops; and he brought an action against the railroad company; and it was held that the tenant could presume that the latter would abate the nuisance; that the law did not require him to remove, but did require the company to abate the nuisance. *Railroad Co.* v. *English*, 73 Ga. 366. The law will not hold it imprudent in a person to act upon the presumption that another will act in accordance with the rights and duties of both, even though he may have formerly conducted himself in a contrary manner. *Newson* v. *Railroad Co.*, 29 N. Y. 383. The subject is discussed in *Kellogg* v. *Railroad Co.*, 26 Wis. 223; *Fraler* v. *Water Co.*, 12 Cal. 555; *Bowas* v. *Tow-Line*, 2 Sawy. 27. See, also, Beach, Contrib. Neg. §§ 10, 13, 18, 23; *Damour* v. *Lyons City*, 44 Iowa, 276. Moreover, if it were held to be negligence on the part of the insured and others to deposit their cotton in the sheds, knowing that the defendant had failed to remove other cotton promptly, as its duty required, still if the defendant, its officers and agents, knew of the negligence of the persons thus depositing their cotton, as the evidence shows that they did, it was their duty to avert the consequence of their negligent acts, and the defendant could not evade responsibility for a failure to do so. *Railroad Co.* v. *Freeman*, 36 Ark. 46.

The claim that the defendant is to be excused because, owing to an unexpected press of business, it had not cars sufficient to remove the accumulating cotton, is not good in law, nor is it sustained by the evidence. A railway company may rightfully decline to receive freight offered when it has not necessary rolling stock and equipments to carry it without delay, but if it receives goods for transportation it is held to a compliance with its contract to transport them without unreasonable delay. *Bussey* v. *Railroad Co.*, 13 Fed. Rep. 330. But while the evidence tends to show a lack of cars belonging to the defendant, or under its control, for moving the freight on its lines in this state generally, the evidence of the principal witness for the defendant on this point, Mr. Hequemberg, is that only 15 or 20 cars were needed for transferring the cotton across the river, and that there were plenty of cars at Little Rock, in 1887, to have removed every bale of it.

Another defense relied on is that the plaintiff is a foreign corporation that had not complied with the laws of this state at the time of the issue of its policies. This defense is based on the act approved April 4, 1887, (Acts Ark. 1887, p. 234,) which provides "that, before any foreign corporation shall carry on any business in this state," it shall file a certificate in the office of the secretary of state, designating an agent, a citizen of this state, upon whom service of process may be made, and that in default thereof the contracts of such foreign corporations with citizens of this state shall be void. There is no force, however, in this defense, since the evidence shows that the contracts of insurance were made in the state of New York, and that the policies were issued in that state. As was said by GRESHAM, J., in *Lamb* v. *Bowser*, 7 Biss. 315, it is hardly competent for the legislature of this state "to declare that the citizens of this state shall not be allowed to make such contracts as they

please out of the state, for the insurance of their property, whether it be within or without the state." Certainly it was not the intention of the legislature to go so far; and the court so held in that case, where the statute was the same, in substance, as our own. Certainly the issuing of a policy in New York, on property here, cannot be considered as the carrying on of business in this state, within the intent and meaning of the statute in question. It is at least doubtful whether the defendant could successfully interpose the defense, even if the issuing of the policies was within the purview of the statute. In the case of *The Manistee*, 5 Biss. 384, the court said:

"If the owner of the cargo had not taken a policy from the agent of this company, but had shipped without insurance, he would be entitled to recover of the carrier, for the loss, the value of the cargo. In my opinion, the carrier should not be permitted to make this defense. The shipper might have brought a libel for the use of the company, and, if the use were not expressed in the record, the court would protect the company, even after a decree in favor of the libelant."

There is another ground upon which this defense must fail. The legislature of this state, in reference to insurance, has always formed a distinct title by itself, and has not been in any way blended with enactments referring to corporations generally. It may be said to form something like a separate code, which has been added to from time to time, as circumstances required. By an act approved April 25, 1873, it was provided, in effect, that no foreign insurance company should do business in this state without first filing with the auditor a stipulation agreeing that any process served on the auditor, or an agent to be designated by the company, should have the same effect as if served on the company; and that, if any such company should cease to maintain an agent in this state, such process might thereafter be served on the auditor. Mansf. Dig. § 3834. This statute accomplishes for foreign insurance companies the same results that are sought to be obtained as to other foreign corporations by the later act. It has been in force for a good many years, and has been found satisfactory. The act of 1887 contains no repealing clause, and as these two statutes are not inconsistent, and implied repeals are not favored, I think that they are both in force, and that the statute of 1887 has no application to insurance companies.

Entertaining these views upon the questions of law that have been raised and discussed, I shall therefore charge the jury as follows: The complaint charges that the defendant and the Union Compress Company, by an agreement between themselves and by a general course of business, made the cotton sheds of the compress company at the foot of Main street a receiving station for cotton to be sent from this city by any one to the compress of said Union Compress Company in Argenta for compression; and that defendant should transport all cotton thus received, and that the defendant failed to transport the cotton thus received promptly, but suffered it to accumulate at said cotton sheds, and in Main street, a public highway of the city, until it became a public nuisance, and was set on fire in Main street, and that by reason of said fire

the cotton insured by it, mentioned in the complaint, was destroyed. The agreement mentioned in the complaint, between the Union Compress Company and the defendant, is admitted in the answer; and it is also admitted that the cotton did accumulate in said cotton sheds, and at the foot of Main street, and that it was fired in said street. But the defendant alleges that it is not responsible for the loss of the cotton mentioned in the complaint, because, owing to an unexpected demand on it for cars for the transportation of freight in the months of September, October, and November, 1887, it could not furnish the means of transportation of the cotton received at said cotton sheds promptly, according to its agreement. The court now instructs you that by said agreement it was the duty of said defendant to transport the cotton thus received at said cotton sheds for shipment promptly to Argenta; and that if defendant failed to do so, and by reason of the continued reception of cotton at said sheds, and the continued giving of bills of lading therefor, as often as demanded by shippers, down to the day of the fire, cotton was suffered to accumulate in said sheds, and on Main street, until it endangered the property of others in the immediate vicinity, and that mentioned in the complaint, then said defendant was guilty of aiding in the creation and maintenance of a public nuisance, and is liable for the loss mentioned in the complaint, and its defense that it was hindered from transporting said cotton from the foot of Main street, by reason of an unexpected pressure of business, is not sustained by the evidence. The defendant has pleaded, further, that it is not liable for the injury complained of in this cause, because Douglas & Co. and the Howell Cotton Company by their own negligence contributed to said loss of said cotton; but the court instructs you that there is no evidence to sustain this defense. If the jury find that the defendant was guilty of aiding in creating, maintaining, or continuing said nuisance as aforesaid, and that the cotton mentioned in said complaint was destroyed by reason thereof, and the jury find that at the time of its loss it was insured against fire by the plaintiffs, and the plaintiffs have since that time and before the bringing of this suit paid the amount of said loss to the insurer, that being the full value of the cotton, the jury will find for the plaintiff, and will assess their damages at the sums thus paid by them, with interest at the rate of 6 per cent. per annum from the date of said payment until the present time. The defendant has pleaded that the policies of insurance mentioned in the complaint were void, because the plaintiffs had not complied with the laws of this state. Upon the evidence this defense is not sustained, and on that issue the jury will find for the plaintiff.